# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FABIANA HILLARY MCLEOD,**<br>**KARINA MCLEOD, and MARK MCLEOD,**<br><br>      **Plaintiffs**<br><br>**v.**<br><br>**THE FESSENDEN SCHOOL,**<br>**UNITED EDUCATORS, and 47 others**<br><br>      **Defendants** | **Civil Action No.:**<br>**1:21-cv-10807** |

## PLAINTIFFS' OPPOSITION TO
## RULE 12(B)[SIC](6)[1] MOTION TO DISMISS GROSS NEGLIGENCE CLAIMS AGAINST THE FESSENDEN TRUSTEES

This Court should **DENY** the Defendant Trustees' "RULE 12(B)[sic](6) MOTION TO DISMISS GROSS NEGLIGENCE CLAIMS AGAINST THE FESSENDEN TRUSTEES" (hereinafter "Motion") based on procedural *and* substantive grounds.

### The Procedural Grounds for Denial of the Defendant Trustees' Motion

On June 4, 2021, the Plaintiffs, pursuant to Fed. R. Civ. P. 4(d), served each Defendant Trustee with "Rule 4 Notice of a Lawsuit and Request to Waive Service of Summons" (see Exhibit 1). Pursuant to Fed. R. Civ. P. 4(d)(3), the Defendant Trustees were required to file an answer to the complaint within 60 days, or by August 3, 2021.

---

[1] The Defendant Trustees' Motion is titled "RULE 12**(B)**(6) MOTION TO DISMISS **GROSS NEGLIGENCE CLAIMS AGAINST THE FESSENDEN TRUSTEES**". The Plaintiffs assume that the "B" is an honest typographical error and the Defendant Trustees base their Motion on Fed. R. Civ. P. 12(**b**)(6). However, the Defendant Trustees' accompanying Memorandum is titled "MEMORANDUM IN SUPPORT OF INDIVIDUAL TRUSTEE DEFENDANTS' MOTION TO DISMISS **COMPLAINT**" (hereinafter, "Memorandum"). The title of the Memorandum implies that the Defendant Trustees are asking this Court to dismiss the Plaintiff's entire Complaint, not just the "GROSS NEGLIGENCE CLAIMS AGAINST THE FESSENDEN TRUSTEES".

On July 29, 2021, the Defendants filed ***Defendants' Motion to Dismiss for Violation of Rule 8 or In The Alternative to Strike Certain Allegations Pursuant To Rule 12(f)*** arguing that the Plaintiffs' Complaint is so confused, ambiguous, vague or otherwise unintelligible that it would be unreasonable to expect the Defendants to frame a response to it.

Now, 7 days ***after*** the deadline imposed by Fed. Rule. Civ. P. 4(d)(3) and in violation of Fed. R. Civ. P. 12(g), the Defendant Trustees have enough understanding of the Plaintiffs' Complaint to file a second motion to dismiss, this time pursuant to Fed. R. Civ. P. 12(b)(6).[2]

"The purpose of Rule 12 is to eliminate unnecessary delays in the early pleading stages of a suit so that all available Rule 12 defenses are advanced before consideration of the merits." Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund, 967 F.2d 688, 691 (1st Cir. 1992). However, Fed. R. Civ. P. 12(g)(2) addresses limitations on serial Rule 12 motions. Rule 12(g)(2) prohibits a defendant from bringing successive motions to dismiss the same operative complaint. Chavez v. Wal-Mart Stores, Inc., Case No. CV 13-6429-GHK (PJWx), 2014 U.S. Dist. LEXIS 194351, 2014 WL 12591252, at *1 (C.D. Cal. June 2, 2014); Fine v. Guardian Life Ins. Co. of Am., No. 3:19-cv-30067-KAR, 2021 U.S. Dist. LEXIS 45728 (D. Mass. Mar. 10, 2021).

Fed. R. Civ. P. 12(g)(2) provides:

> "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from the earlier motion."

Rule 12(h)(2) restricts a defense under Rule 12(b)(6) not raised in the party's initial motion to dismiss to be raised only in a pleading allowed or ordered under Rule 7(a) (i.e., an answer to a complaint); in a motion under Rule 12(c) (motion for judgment on the pleadings); or at trial.

---

[2] Since the Defendant Trustees are now suddenly able to frame a response to the Plaintiff's Complaint, the Court should deny the DEFENDANTS' MOTION TO DISMISS FOR VIOLATION OF RULE 8 OR IN THE ALTERNATIVE TO STRIKE CERTAIN ALLEGATIONS PURSUANT TO RULE 12(f).

Therefore, ***Rule 12(g) operates in conjunction with Rule 12(h) to require that all defenses permitted to be raised by motion must be included in the same motion***. <u>Glater v. Eli Lilly & Co.</u>, 712 F.2d 735 (1st Cir. 1983).[3]

Therefore, this Court should dismiss, on procedural grounds, the Defendant Trustees' Motion because it was filed ***after*** the 60-day deadline imposed by Fed. R. Civ. P. 4(d)(3) ***and*** because it violates Rule 12(g)'s prohibition against the Defendant Trustees from bringing successive motions to dismiss the same operative complaint.

## The Substantive Grounds for Denial of the Defendant Trustees' Motion

On a motion to dismiss pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 2007) (citing <u>Rogan v. Menino</u>, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is ***plausible*** on its face. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Id</u>. at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 556).

### <u>The Defendant Trustees' "no legal duty" argument fails</u>

The Defendant Trustees want this Court to rule ***as a matter of law*** that the Trustees of The Fessenden School had no legal duty to protect its students from sexual molestation by staff. However, the Defendant Trustees do not cite to any statute or precedent that explicitly, expressly, or unequivocally states that trustees of a private school for children do not owe the

---

[3] In <u>Glater v. Eli Lilly & Co.</u>, 712 F.2d 735 (1st Cir. 1983), the Defendant, Eli Lilly & Co., was represented by Attorney Frank Dennis Saylor, IV of Goodwin, Procter & Hoar.

children a duty of care such that negligence claims against the trustees must fail as a matter of law. There is no statute or precedent that automatically immunizes trustees of a private school for children against claims of negligence. These cases are decided on a case-by-case analysis of the facts of each particular case.  Therefore, the Defendant Trustees' reliance on several cherry-picked cases is misplaced.[4]

For example, the Defendant Trustees rely on Bash v. Clark Univ., 2006 WL 4114297, at *5 (Mass.Super. Nov. 6, 2006). In Bash, a student alone in her dormitory room killed herself by injecting herself with a lethal dose of heroin. The student's father brought a wrongful death action against Clark University and nine individuals for the death of his daughter. The Bash Court found that under the particular circumstances of the case, the defendants did not owe the student/decedent a legal duty of care that extended into her private life in her own room because such a duty would be unrealistic in scope and overly intrusive to implement.

> First, courts in other jurisdictions have balanced the foreseeability of harm with what steps would be necessary to protect students. This court finds this balancing approach to be the most appropriate way to resolve the issue at hand. "The question is whether the risk of harm is sufficiently high and the amount of activity needed to protect against harm sufficiently low to bring the duty into existence . . ." Baldwin v. Zoradi, 123 Cal. App. 3d 275, 286, 176 Cal. Rptr. 809 (1981) . . .

> Second, it is not appropriate to ground the existence of a legal duty on the part of university officials and staff on the basis of unrealistic expectations about their ability to protect their students from the dangers associated with the voluntary use of illegal drugs. . .

---

[4] The Defendant Trustees rely on Lyon v. Morphew, 424 Mass. 828 (1997) but because the facts of Lyon are so far removed from the case at bar the Plaintiffs will not address Lyon except to say that in Lyon, the plaintiff was employed by an independent roofing contractor hired by Brigham and Women's Hospital to replace the roof on a building. On the first day of work, the plaintiff fell off the roof. The plaintiff filed suit against the hospital's executives and others. The Lyon court held: "The hospital's chief operating officer had a general supervisory role with regard to the [hospital's] engineering department. This responsibility, alone, is not enough to support a finding that she personally participated in acts causing harm to the plaintiff.

Third, recognition of the existence of a legal duty on the part of
university officials and staff in this case would conflict with the
expanded right of privacy that society has come to regard as the
norm in connection with the activities of college students. The
incursion upon a student's privacy and freedom that would be
necessary to enable a university to monitor students during
virtually every moment of their day and night to guard against the
risks of harm from the voluntary ingestion of drugs is unacceptable
and would not be tolerated. . .

In finding that no legal duty existed, the <u>Bash</u> court relied on an exhaustive analysis of

the particular ***facts*** of the case.  The Bash court found that it would be "unrealistic" for the

defendants to protect students from their voluntary use of drugs in their own private rooms. In

the instant case, Fabiana McLeod was a child, not an adult student. She did not harm herself in

the privacy of her dormitory room.  She was molested by Defendant Leung, a staff member of

The Fessenden School. It should not be an "unrealistic expectation" for the Defendant Trustees

to implement policies and procedures to protect students like Fabiana McLeod from unwanted

advances and sexual assaults by members of The Fessenden School staff.

The Defendant Trustees also rely on <u>Doe v. Emerson College</u>, 153 F. Supp. 3d 506

(D. Mass. 2015, Saylor, J.).

"[Doe] is an action arising out of a college's investigation of an alleged sexual
assault. Plaintiff Jane Doe is a student at Emerson College in Boston,
Massachusetts. She alleges that she was sexually assaulted off-campus, once at
a party in Cambridge and later in a Boston alleyway.

Doe originally reported to Emerson officials and police that she was raped by a
male MIT student at an MIT fraternity party. The complaint acknowledges that a
DNA test was performed after the alleged assault, and that the evidence did not
support her claim. The test did, however, show the presence of female saliva.
More than a month after Doe first reported the assault, she changed her account
to allege that a female Emerson student held her down while the MIT student
raped her, and that the female student also performed oral sex on her. Emerson
investigated Doe's allegations; the investigation concluded that there was
insufficient evidence of a sexual assault to satisfy a preponderance of the
evidence standard.

The complaint further alleges that the same two individuals later confronted her
on a Boston street and pushed her into an alleyway, where the female grabbed
at her crotch. Emerson investigated that allegation, as well, and concluded that
the claim was not supported by a preponderance of the evidence.

The complaint alleges that the defendants, Emerson and certain of its employees, failed to promptly and appropriately investigate the alleged assaults, subjecting Doe to a hostile environment and effectively denying her access to educational opportunities. The complaint names Emerson and six employees—including the President and Dean of Students—and includes four claims: (1) violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, against Emerson; (2) negligence against all defendants; (3) negligent infliction of emotional distress against all defendants; and (4) intentional infliction of emotional distress against Emerson and four employees. Doe, 153 F. Supp. 3d at 508.

In Doe, this Court concluded that, based on the unique facts of the case, no legal duty was owed to the student to prevent this type of attack:

To the extent that Doe's negligence claim rests on the contention that Emerson owed her a duty to prevent the consumption of alcohol or use of drugs by herself or other students, Emerson is entitled to judgment on the pleadings. Massachusetts does not impose a legal duty on colleges or administrators to supervise the social activities of *adult* students, even though *the college may have its own policies* prohibiting alcohol or drug abuse. See Bash v. Clark Univ., 2006 Mass. Super. LEXIS 657, 2006 WL 4114297, at *5 (Mass. Super. Nov. 6, 2006) (imposing no duty on a college to protect a first-year student from overdosing on heroin even where the school had a policy against illegal drug possession). Imposing such an affirmative duty on colleges would be impractical and unrealistic. To say the least, it is unclear how Emerson could reasonably prevent its own students from consuming alcohol, never mind how it would prevent consumption by persons with whom it had no relationship at all. See id. (noting that the tragic consequences of a student's voluntary overuse of drugs or alcohol are not *reasonably foreseeable* because "a university cannot prevent these incidents from occurring except possibly by posting guards in each dorm room on a 24-hour, 365-day per year basis" (citation omitted). Doe, 153 F. Supp. 3d at 514.

In contrast to the facts of the Doe case, Fabiana McLeod was 13 and 14 years old when she was molested over the course of two summers on The Fessenden School campus. She was not an adult student placing herself in harm's way by drinking too much. She was molested inside her own dormitory room on The Fessenden School campus, not wandering around off campus. The Doe case and Fabiana McLeod's case are polar opposites.

Moreover, The Fessenden School apparently did not have its own policies or training aimed at preventing its teachers from crossing boundaries and sexually abusing children. Given the sordid history of sexual abuse at The Fessenden School dating back to the 1960s, sexual

abuse was reasonably foreseeable, which can give rise to a legal duty, as the <u>Doe</u> Court recognized:

> The alleged sexual assault on October 13, 2012, occurred at an MIT fraternity. To the extent that Doe's negligence claim rests on the premise that Emerson had a legal duty to protect her from the criminal acts of her alleged assailants at the party, Emerson is also entitled to judgment on the pleadings. "[A]s a general rule, there is no duty to protect another from the criminal conduct of a third party" **unless (1) there is a special relationship between the defendant and the injured victim, and (2) the criminal conduct is reasonably foreseeable**. <u>Kavanagh v. Trustees of Boston Univ.</u>, 440 Mass. 195, 201, 795 N.E.2d 1170 (2003); see also <u>Mullins v. Pine Manor Coll.</u>, 389 Mass. 47, 54-55, 449 N.E.2d 331 (1983) (finding a duty for the college to provide physical security measures like additional security guards to prevent foreseeable sexual assaults by trespassers because there were "dangers inherent in being housed at a women's college near a metropolitan area only a short distance from bus and train lines"). ***As a general matter, Emerson owed a special duty to Doe as a student housed in a facility on its campus. However, under the circumstances presented here, that duty did not extend so far as to require Emerson to protect her when she voluntarily left the campus and attended a party that was not affiliated in any way with Emerson***. <u>Doe</u>, 153 F. Supp. 3d at 514-515 (emphasis supplied).

This Court's ruling in <u>Doe</u> is applicable to the Plaintiffs' claims in this action. The Defendant Trustees had a "special relationship" with Fabiana McLeod, an unaccompanied underage girl being housed on their campus, that gave rise to a legal duty of care to protect her. That same legal duty of care would also have also extended to the New York hotel room where Fabiana McLeod was also molested while on a field trip sponsored by The Fessenden School. The <u>Doe</u> court continued:

> Furthermore, even assuming that Emerson should have been aware as a general matter that its students may be subject to sexual assaults, it does not follow that Emerson could reasonably be expected to anticipate and prevent a sexual assault occurring at an off-campus party. Emerson does not provide security or supervision at MIT fraternities, nor could it. Moreover, the complaint does not appear to allege that Emerson should have known, or reasonably could have known, that the MIT student or Student A posed a danger to Doe, at least before Doe reported the incident. See <u>Kavanagh</u>, 440 Mass. at 203-04 (noting that a negligence claim based on the criminal conduct of a third party must include "specific information . . . suggesting a propensity" for harmful conduct of which the defendant should have been aware**). If there were reasonable additional steps that Emerson should have taken to prevent the assault, the complaint does not identify them**. <u>Doe</u>, 153 F. Supp. 3d at 515 (emphasis supplied).

In contrast to the complaint in <u>Doe</u>, Plaintiffs' Complaint in the instant case lists numerous safety measures that The Fessenden School could have implemented to prevent sexual assaults on its campus.[5] (See Cause of Action III, Paragraphs 203 -206.) Paragraph 204 lists 13 measures the Defendant Trustees could have implemented, including having polices and training in place on the following matters:

i. descriptions of reporting requirements for allegations and/or suspicions of child sexual abuse

ii. descriptions of what constitutes school employee sexual misconduct

iii. expectations for volunteers

iv. guidance in identifying and reporting behaviors that might indicate school employee sexual misconduct toward a child

v. a statement concerning The Fessenden School's commitment to prevention of school employee sexual misconduct

vi. a statement that there is no such thing as consensual sex between adults employed by and/or associated with The Fessenden School and minor children

vii. descriptions of acceptable and unacceptable behavior

viii. requirements for training for prevention of educator sexual abuse

ix. inclusion of The Fessenden School policies and procedures concerning inappropriate sexual conduct in staff, student, and parent handbooks

x. a statement about retaliation

xi. a list of potential sanctions and penalties for school employee sexual misconduct toward a minor child

xii. investigation requirements

xiii. included examples of grooming behaviors

---

[5] Plaintiffs' expert, Charol Shakeshaft, Ph.D. is expected to testify regarding the policies and procedures The Fessenden School should have developed and implemented to protect Fabiana Mcleod. The Plaintiffs have previously identified Dr. Shakeshaft as an expert. Dr. Shakeshaft is an educational researcher noted for her studies on sexual abuse of students by school staff. In 2004, Dr. Shakeshaft was commissioned by the United States Department of Education to review the available literature on sexual misconduct with students by public school employees.

Paragraph 204 of the Plaintiffs' Complaint also lists an additional 21 safety measures the Defendant Trustees should have taken to prevent sexual assault and rape on the campus, including the rape of Fabiana McLeod:

i. informing teachers, students, and parents of The Fessenden School's policies on child sexual abuse

ii. training all staff on appropriate procedures to report suspicions of school employee sexual misconduct with students

iii. training all staff on creating and maintaining a safe environment for children

iv. training all staff on maintaining appropriate boundaries with students

v. training all staff about what constitutes school employee sexual misconduct

vi. emphasizing that reporting suspicions of school employee sexual misconduct toward students or minor children is a professional responsibility and a law

vii. training teachers of what specific and/or general behaviors are acceptable and unacceptable

viii. providing school employee sexual misconduct training to all school staff who will have direct contact with students and/or minor children, not just teachers

ix. training all staff to recognize warning signs of child sexual abuse

x. teaching staff how to communicate with the suspected victim (i.e., not embarrass, punish, or stigmatize him or her)

xi. training school personnel on the short-term effects child sexual abuse can have on victims

xii. training school personnel on the long-term effects child sexual abuse can have on victims

xiii. ensuring that staff meet certification or employment requirements documenting that they have completed the training on school employee sexual misconduct

xiv. training all staff to recognize warning signs of school employee sexual misconduct

xv. training staff annually

xvi. training students on school employee sexual misconduct and child sexual abuse

xvii. providing multifaceted training that utilizes different teaching styles, different levels of interactivity, and different types of training materials

xviii. training staff on how to talk to minor children about sexual abuse

xix. designating one school staff member to be the case coordinator to handle all incidents of school employee sexual misconduct

xx. train students concerning sexual abuse annually

xxi. train parents concerning sexual abuse annually

Despite the factual differences between <u>Doe</u> and Fabiana McLeod's case, the Defendant Trustees still claim that the <u>Doe</u> case is "instructive, and should be followed here," (Defendant Trustees' Memorandum, pp. 5-6), even beginning their argument by stating "[a]s a general rule, there is no duty to protect others from the criminal acts of a third party." In making this argument, the Defendant Trustees fail to address, or even mention, the Massachusetts Supreme Judicial Court's holding in <u>Mullins v. Pine Manor College</u>, 389 Mass. 47, 54 (1983).

<u>Mullins</u> is cited in this Court's <u>Doe</u> opinion as precedent for the proposition that under the right circumstances there can arise a duty of care to protect others from the reasonably foreseeable criminal acts of a third person. The <u>Doe</u> Court found "a duty for the college to provide physical security measures like additional security guards to prevent foreseeable sexual assaults by trespassers because there were 'dangers inherent in being housed at a women's college near a metropolitan area only a short distance from bus and train lines'". The Plaintiffs in the instant case allege similar circumstances existed at The Fessenden School during the summers of 2015 and 2016 when Fabiana McLeod was housed alone in a secluded, unsecured dormitory room easily accessible by Leung. The Fessenden School's sordid history alone gives rise to a duty of care to implement policies, procedures, and training to protect such students.

**The Defendant Trustees' "immune from liability for ordinary negligence" argument fails**

In their Motion, the Defendant Trustees state, "[p]laintiffs' allegations are insufficient as a matter of law to *plausibly* suggest that the trustees engaged in an "act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care." At this stage of the pleadings, the Plaintiffs burden is to present sufficient "[f]actual allegations to raise their right to relief above the speculative level." The Plaintiffs' Complaint and its attached Exhibits clearly satisfy that burden by stating sufficient facts to raise their right to relief above the speculative level.

1. In 2011, 2016, and 2018, former students of The Fessenden School made claims that they had been sexually abused in the past by employees of The Fessenden School. The

10

Defendant Trustees were not distant bystanders when The Fessenden School publicly responded to those allegations. Instead, The Defendant Trustees inserted themselves squarely into the middle of the school's response when they publicly announced their plans to develop and implement new policies and comprehensive procedures to protect children on The Fessenden School campus. The Defendant Trustees made these announcements in three letters, one for each year, signed by then Headmaster Stettler, who is also a Defendant in this action.[6] Notably, the 2016 letter was written just weeks before Fabiana McLeod returned to the school's campus for her second summer.

2.      In each letter, Stettler invoked the "***Board of Trustees***".

- In 2011, Stettler's letter stated, "In April 2011, the School received a second letter claiming abuse on campus . . . As the ***Board of Trustees*** and administration absorbed this disclosure, we recognized the likelihood that these incidents were not necessarily isolated" and "***The Board of Trustees*** and I are resolved to help the healing process".

- On May 5, 2016, Stettler's letter stated, "I have made every effort, with the full support of our ***Board of Trustees***, to model our School's values of honesty, compassion, and respect in every decision and action." Fabiana Mcleod would have been a beneficiary of the specific measures referred to by Stettler and the Defendant Trustees to keep students safe. A few weeks after Stettler and the Defendant Trustees published their May 5, 2016 letter, 14-year-old Fabiana McLeod was being repeatedly and brutally raped in a secluded room in the Sanderson dormitory on The Fessenden School campus and in Leung's New York City hotel room while on a field trip sponsored by The Fessenden School.

---

[6] These three letters, publicly available on The Fessenden School web site, are included in the Plaintiffs' Complaint as Exhibits 1-3.

- In 2018, Stettler's letter stated, "The **_Board of Trustees_** and I believed that it was time to shine a light on this issue that has too often, and for too long, been hidden in societal shadows."

3. In each letter, Stettler described the actions he and the Defendant Trustees were taking or would be taking to protect children on The Fessenden School campus from sexual abuse. The 2011 letter stated:

- "With our faculty and staff, we have emphasized the importance of raising our collective consciousness and reiterated our expectation of vigilance in identifying and recognizing signs of questionable behavior."

- "Our administrative team and faculty have reviewed and revised the existing policies and guidelines regarding interactions between adults and children in our school community."

- "In our opening faculty meetings this fall, as we have done in previous years, we held discussions on maintaining boundaries in our relationships with our students, and we are committed to sustaining ongoing training."

- "We are reexamining our school-wide wellness curriculum to affirm that we are giving our boys the tools and understandings that they need in order to help maintain their own safety."

- "As required by Massachusetts state law, our hiring process for faculty and staff includes mandatory Criminal Offender Record Information and Sex Offender Registry Information background checks."

- "We have zero tolerance for sexual misconduct and abuse."

- "Parents in particular may want to know if we plan to address this communication and its content with our students. At this time, we do not plan to talk directly with the boys about it. In the course of our wellness curriculum, the issue of boundaries is addressed in age-appropriate ways and will continue to be emphasized."

The 2016 letter stated:

- "I have made every effort with the full support of our Board of Trustees to model our School's values of honesty and compassion in respect in every decision and action."

- "Our community regularly participates in personal safety, wellness, and boundaries training, and a character education program is woven into the fabric of the school."

- "We are resolute in our commitment to protect our students and have zero tolerance for sexual misconduct or abuse."

- "Our community continually strives to ensure that our boys feel comfortable to be themselves, to discover their passions, and to reach out to members of the faculty and staff with any type of concern."

And the 2018 letter stated:

- "In my earlier letters to the community, I have described the education of our students, employee screenings, mandatory employee training, policies, procedures, protocols, and practices that are currently in place."

4.  Clearly the Defendant Trustees inserted themselves directly into the middle of the ongoing crisis of sexual abuse occurring on campus. They were not disconnected bystanders. Instead, with the 2011, 2016, and 2018 letters, the Defendant Trustees announced to the public their clear and express intention to strengthen the school's policies and procedures to protect children at The Fessenden School.

5.  Between August 2020 and May 2021, the Plaintiffs' counsel repeatedly asked to see any documents that showed the Defendant Trustees had actually developed and implemented the many policies and procedures they announced in the 2011, 2016, and 2018 letters. (See Plaintiffs' Complaint, Paragraph 183.) However, only *a single sheet of paper*, a 2004 CORI report concerning Defendant Leung, was produced. Clearly, the claims the Defendant Trustees had made in the 2011, 2016, and 2018 letters were not made in good faith.

6.  In summary, the Defendant Trustees' policies and procedures to protect children as advertised in the three Stettler letters, but apparently never really implemented, included the following steps:

a.      *"vigilance in identifying and recognizing signs of questionable behavior"*

This step would have been useful had it been actually implemented so that The Fessenden

School's teachers, counselors, and students could have recognized Lueng's questionable

behavior of arriving at The Fessenden School each summer accompanied by underage

girls but without parental permission slips or health care information.

b.      *"review[ing] and revis[ing] the existing policies and guidelines regarding*
        *interactions between adults and children"*

Unfortunately, there were no "existing guidelines" to review or revise. The Trustee

Defendants make the Plaintiffs' case in their Memorandum:

> At some point, an unidentified counselor and some of the other
> middle school volunteers from Concord allegedly "approached
> Leung and said, 'We know you're close with her [i.e., Fabiana], but
> it looks really strange and people would be concerned.'" (Id., ¶
> 158). However, the counselor did not report any such concerns.
> (Id.). Defendant Trustees' Memorandum, p. 2.

Had the Defendant Trustees' actually implemented effective policies and procedures and

actually trained its staff in identifying suspicious behavior, the unidentified counselor

mentioned above would have reported that "strange" and "concern[ing]" behavior to the

proper authorities.  Instead, because of the lack of proper training and clear guidelines,

"the counselor did not report any such concerns." In the absence of training and

guidelines, who was the unidentified counselor supposed to report his suspicions to? In

the absence of training and guidelines, in what form should the unidentified counselor

have made his report? The student in question was Fabiana McLeod. A simple, mandated

report of Leung's suspicious behavior likely would have prevented her ordeal.

c.      *"[holding] discussions on maintaining boundaries in [] relationships with []*
        *students"*

If the Defendant Trustees had acted in good faith and actually implemented the policies

they advertised, "holding discussions about maintaining boundaries" would have

empowered the unidentified counselor to respond appropriately to Lueng's inappropriate

behavior towards Fabiana McLeod. Such discussions would have also empowered Fabiana McLeod to report Leung's inappropriate advances to the proper authorities.

**d.      "[a commitment] to sustaining ongoing training"**

If the Defendant Trustees had acted in good faith and actually implemented the policies they advertised, "ongoing training" of staff likely would have prevented Fabiana McLeod's ordeal.

**e.      "a hiring process for faculty and staff [that] includes mandatory Criminal Offender Record Information and Sex Offender Registry Information background checks"**

If the Defendant Trustees had acted in good faith, a robust hiring process, including annual background and reference checks, would have lessened the likelihood that Fabiana McLeod McLeod would have been sexually assaulted and raped by Leung.

**f.      a "zero tolerance for sexual misconduct and abuse"**

If the Defendant Trustees had acted in good faith and actually implemented the policies they advertised, a real "zero tolerance" policy, if made part of each students' orientation and each teacher's continuing training, would have provided Fabiana McLeod with defenses against Leung's unwanted advances.

**g.      "[addressing] the issue of boundaries [] in age-appropriate ways"; "personal safety, wellness, and boundaries training"; "a character education program"; "commitment to protect [] students", "the education of [] students [concerning sexual abuse], employee screenings, mandatory employee training, policies, procedures, protocols, and practices", etc.**

If the Defendant Trustees had acted in good faith, all of these measures, or any one of them, if incorporated into the school's regimen, would likely have saved Fabiana McLeod from her attacker.

To be clear, the Plaintiffs' do ***not*** claim that the Defendant Trustees' policies and procedures were simply inadequate or did not go far enough - that would be ordinary negligence. Similarly, the Plaintiffs do ***not*** claim that the Defendant Trustees simply failed to address a dangerous condition on campus - that too would be ordinary negligence. ***Instead, the Plaintiffs***

15

***allege that Defendant Trustees announced that they had developed and implemented policies and procedures to protect children when, in fact, they had not.*** Plaintiffs allege the policies and procedures announced in the three Stettler letters were shams.[7] The Defendant Trustees lied to The Fessenden School community.  And because they proudly published the letters on the Internet, they lied to the world.[8] The Defendant Trustees did not act in good faith.

## The Defendant Trustees' "no gross negligence" argument fails

In their Memorandum, the Defendant Trustees state, "The Complaint allegations are insufficient to demonstrate . . . that a jury could reasonably find that their alleged nonfeasance constitutes gross negligence." This is not the correct legal standard this Court should apply when ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

Although the determination of a defendant's level of negligence is usually a matter of fact to be decided by a jury, the Defendant Trustees want to the Court to decide, before the pleadings are closed and before any discovery has been conducted that the Defendant Trustees are not grossly negligent as a matter of law. At this stage of the pleadings, the Plaintiffs' factual allegations must be enough to raise a right to relief above the speculative level. 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, pp 235-236 (3d ed. 2004). Fed. R. Civ. P. 12(b)(6) only requires sufficient facts to state a claim for relief that is plausible on its face. The Plaintiffs have met that burden. The factual allegations in the Plaintiffs Complaint are sufficient to support a claim that the Defendant Trustees did not act in good faith.  As such, the Plaintiffs have met their burden and this Court should deny the Defendant Trustees' Motion.

---

[7] The Court may ponder what was the purpose of the three letters? The answer may be found in the ProResponse Endorsement of The Fessenden School's United Educators insurance policy. This endorsement defines a "ProResponse Event" as "an actual or threatened event or interrelated series of events which results in the actual or imminent publication of information that, in the reasonable judgment of the . . . Trustees, has or would have a material, harmful effect on the Educational Organization's reputation, standing and support in the community" According to the Policy, the "ProResponse Limit" is "$100,000 for all ProResponse Costs . . . of which . . . $15,000 is available as immediate expense without our prior approval for payment of a Crisis Communications Firm . . . an additional $35,000 is available with prior written approval".

[8] The Fessenden School prides itself a an internationally recognized school for children. See Plaintiffs' Complaint, Paragraphs 113, 117-118.

The legal standard at this stage of the pleadings is not what "a jury could reasonably find." That is a summary judgment standard.

Since the Plaintiffs have met their burden, no further argument should be necessary. However, because the Defendant Trustees have pointed to M.G.L. c. 231, § 85K in Footnote 1 of their Memorandum, the Plaintiffs feel obliged to address this statute.

The second paragraph of M.G.L. c. 231, § 85K[9] states, in pertinent part:

> No person who serves as a director, officer or trustee of an educational institution which is, or at the time the cause of action arose was, a charitable organization, qualified as a tax–exempt organization under 26 USC 501(c)(3) and who is not compensated for such services, except for reimbursement of out of pocket expenses, shall be liable solely by reason of such services as a director, officer or trustee for any act or omission resulting in damage or injury to another, **if such person was acting in good faith** and within the scope of his official functions and duties, **unless such damage or injury was caused by willful or wanton misconduct**.

M.G.L. c. 231, § 85K, establishes a complete liability defense for a "person" acting as trustee of an educational institution for actions done "***in good faith*** and within the scope of his official functions," <u>Giardi v. Dunning</u>, 563 F. Supp. 2d 305 (D. Mass. 2008). If a jury determines that the Defendant Trustees did not act in good faith,[10] then they are liable irrespective of whether their misconduct was willful *or* wanton. In order for the Defendant Trustees to immunize themselves from liability, the jury would have to find, after hearing the Court's jury instructions concerning "good faith", "willful misconduct", and "wanton misconduct", that they acted in "good faith" ***and*** the Plaintiffs' damages and injuries were ***not*** caused by willful ***OR*** wanton misconduct.

---

[9] Incidentally, M.G.L. c. 231, § 85K does not rely on, or even mention, the phrase "gross negligence" or the word "reckless". Therefore, the Defendant Trustees' arguments based on this phrase or word, or based on case law related to this phrase or word, are inapplicable to this case.

[10] "The definition of 'good faith' according to *Black's Law Dictionary* (7<th> Ed. 1999) is a 'state of mind consisting in…honesty in belief or purpose…[and] absence of intent to defraud or to seek unconscionable advantage.'" <u>Eliades v. Callahan</u>, 15 LCR 277, 279 n.6 (Mass. Land Ct. 2007).

Wanton misconduct amounts to what has been variously described as indifference to or disregard of probable consequences to the injured party. What must be intended is the conduct, not the resulting harm. Commonwealth v. Welansky, 316 Mass. 383 (1944). The Defendant Trustees were indifferent to or disregarded the probable consequences that children would be sexually assaulted on The Fessenden School campus if they announced the development of policies and procedures to protect children, but, in fact, did not develop such policies and procedures. To constitute wanton misconduct, as distinguished from mere negligence, grave danger to children must have been apparent. The Defendant Trustees clearly chose to run the risk rather than alter their conduct, by taking real steps to protect children, between 2011 and 2018, so as to avoid the act which caused the harm.

In the 2011, 2016, and 2018 letters, the Defendant Trustees acknowledged the clear and present danger of sexual abuse of students on campus and acknowledged the severe emotional consequences sexual abuse has on children. Acknowledging this danger, the Defendant Trustees were obliged to act to protect their students.  Claiming to take steps to prevent sexual abuse, but in reality not taking any steps, amounts to wanton misconduct. "But even if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct in his dangerous act or omission, if an ordinary normal man under the same circumstances would have realized the gravity of the danger." Commonwealth v. Welansky, 316 Mass. 383, 398-399 (1944).

The Defendant Trustees' willful decision to advertise policies and procedures to protect children but not really implement them shows bad faith. The failure to implement the the policies and procedures to protect children when the Defendant Trustees knew the consequences of their failure shows wanton misconduct.

## **CONCLUSIONS**

The Defendant Trustees had a legal duty to Fabiana McLeod and derivatively to her parents, Mark and Karina McLeod.

18

The 2011, 2016, and 2018 letters are an implicit admission of that duty.

The Plaintiffs have plead sufficient facts to plausibly suggest that the Defendant Trustees had a duty to the Plaintiffs and were willfully and wantonly negligent.

The Plaintiffs have produced sufficient facts to plausibly suggest that the Defendant Trustees did not act in good faith. The Plaintiffs have produced sufficient facts to plausibly suggest that Fabiana McLeod's damages and injuries were foreseeable and caused by the Defendant Trustees' willful *or* wanton misconduct, i.e. their claims that they had put in place policies and procedures to protect children when then in reality had not put such policies and procedures in place.

Ordinary negligent misconduct is a simple failure to act. Willful *or* wanton misconduct is claiming you are acting when in fact you know you are not acting and you know your failure to act can result in substantial harm. In other words, wanton or reckless misconduct consists of *intentional* failure to take such care in disregard of the probable harmful consequences to the children.

Since the grave danger to children was in fact realized by the Defendant Trustees (as indicated in the three letters), their subsequent intentional voluntary act – i.e. making false claims that they were instituting policies and procedures to protect children when they did not implement any policies or procedures to protect children - which caused the foreseeable harm to the Plaintiffs amounts to wanton conduct.

**WHEREFORE**, the Plaintiffs respectfully request that this Court **DENY** the Defendant Trustees' RULE 12(B)[sic](6) MOTION TO DISMISS GROSS NEGLIGENCE CLAIMS AGAINST THE FESSENDEN TRUSTEES.

Respectfully submitted,
The Plaintiffs,
By their attorney,


*/s/ Domenic Paolini*
_____
Domenic Paolini, Esq.
BBO # 643215
office: 617.951.0300
cell: 617.372.1514
email: dpaolini@paoliniandhaley.com

Richard M. Haley, Esq.
BBO # 553253
email: rhaley@paoliniandhaley.com

**PAOLINI & HALEY**
400 Tradecenter Drive
Suite 5900
Woburn, MA 01801


Dated: August 22, 2021